# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ANTHONY CAMPBELL,

            **Plaintiff,**                    **Case No. 2:10-cv-1129**
                                                 **JUDGE GREGORY L. FROST**
      **v.**                                 **Magistrate Judge Norah McCann King**

SCOTT J. NALLY, et al.,

            **Defendants.**

## OPINION AND ORDER

In this case, Plaintiff Anthony Campbell contends that Defendants have engaged in unlawful racial discrimination in connection with Plaintiff's employment with the Ohio Environmental Protection Agency. Before the Court are Defendants' motion for summary judgment (ECF No. 56), Plaintiff's memorandum in opposition (ECF No. 65), and Defendants' reply brief in support (ECF No. 68). For the reasons set forth below, Defendants' motion is **GRANTED** and judgment shall be entered in Defendants' favor.

### I.  Background

The Ohio Environmental Protection Agency ("Ohio EPA") hired Plaintiff Campbell as a chemist in 1997. Campbell later became an "Environmental Specialist II" and, from 1999 until 2006, performed duties related exclusively to the "Mound" site in Miamisburg, Ohio. Campbell's duties included reviewing the site for the federal Office of Federal Facilities Oversight ("OFFO"), to ensure that federal contractors properly cleaned up and restored it.[1] Defendant Brian Nickel was Campbell's supervisor; Nickel has been Campbell's supervisor

---

[1]The United States Department of Energy owned the Mound site.

since 1998.

In 2006, Campbell considered transfer options within Ohio EPA as clean-up work at the Mound site wound down. He discussed different options with Nickel, OFFO head Graham Mitchell, and Ohio EPA Southwest District Chief Tom Winston. Campbell considered possible work in the Ohio EPA's Emergency Response ("ER") unit, the Solid and Infectious Waste division, and the Drinking Water division. (I Campbell Dep. 50-51, ECF No. 51.) Winston and Mitchell discussed with Campbell a "50/50" position, whereby Campbell would continue to review remediation work at the Mound site and also work part-time in the ER unit. Campbell also met with Jim Crawford and Dale Farmer about the ER unit. A few days after that meeting, Campbell confirmed his interest in working with the ER unit and in having Defendant Nickel remain his supervisor. (*Id.* at 53 and Ex. 7.)

Campbell did not formally apply for a transfer to or interview for the position with the ER unit. His position title remained "Environmental Specialist II," but Ohio EPA changed his job description to provide that 40 percent of his work consisted of "spill response." (*Id.* at 57-58 and Ex. 22-B.) At the time Campbell began work with the ER unit in the Southwest District Office of the Ohio EPA, Crawford, Farmer, and Dave Combs worked in the unit as "on-scene coordinators." (*Id.* at 58-59; II Campbell Dep. 227-28, ECF No. 52.) Crawford had more than 28 years of experience working in ER and served as a "technical expert"; Farmer had more than 20 years experience in ER. (I Campbell Dep. 58-59.) Combs worked only part-time in the ER unit, splitting his time between ER and the Ohio EPA special investigations unit, but had more than 10 years experience in ER. (*Id.* at 59; II Campbell Dep. 228.) Nickel was the direct supervisor for all but Combs.

Campbell's duties in the ER were to be in the role of an on-scene coordinator. An on-scene coordinator in the ER unit is responsible for serving as a first responder to environmental spills in order to assess their scope and danger and provide oversight and instruction for clean-up. (Crawford Aff. ¶ 3, ECF No. 56-1.) Another important duty of an on-scene coordinator is to properly document a spill and the response thereto, consistently with applicable Ohio EPA rules and regulations. (*Id.*) By Campbell's own admission, training was required in order to perform these emergency response functions. (II Campbell Dep. 296, ECF No. 52.)

During 2006 and 2007, as part of his training, Campbell regularly reviewed reports prepared by Crawford and Farmer, in order for Campbell to familiarize himself with the sort of work product he would be required to produce for the ER unit. (Crawford Aff., ¶ 4.) Also during 2006, Campbell "shadowed" Crawford and Farmer during the performance of their duties, attended an oil spill field training at the United States EPA office in Cincinnati, and attended a hazardous materials training. (I Campbell Dep. 73-74 and Ex. 12.) In 2007, Crawford also prepared a training document for Campbell to review as a new on-scene coordinator; the document was intended to "accelerate" Campbell's understanding of the ER program. (Crawford Aff., ¶ 5; Nickel Dep. 10, ECF No. 53.)

According to Crawford, Campbell had not shown improvement in his report writing skills or his spill response skills by the end of 2007. (Crawford Aff., ¶ 6.) Crawford continually expressed his frustration about Campbell's performance to Nickel, Defendant Mike Starkey, and Kevin Clouse. (*Id.*; Nickel Dep. 11-14.) By mid-2008, both Crawford and Nickel were concerned about whether Campbell could be an on-scene coordinator. (*Id.* at 14.) In particular, Nickel and Crawford were wary of Campbell's report-writing ability, his knowledge of the rules

and regulations, his ability to make "quick decisions" in the field, and his ability to handle the complexities of "large spills." (*Id.*) Also, in 2008, a manager from Ohio EPA's central ER office, James Mehl, questioned Campbell's decision making and errors in the reports that Campbell prepared for the Ohio EPA's central office. (Hines Aff. ¶ 4 and Ex. 1, ECF No. 56-2.)

In August 2008, Campbell met with Nickel and Starkey to discuss specific areas of improvement needed with respect to Campbell's ER work. (I Campbell Dep. 133-34 and Exs. 23, 23-A.) Among other things, Campbell was specifically instructed to review and study the training guidance document that Crawford had given him in May 2007 and to meet semi-monthly "at a minimum" with Crawford and Nickel to assess his training progress and discuss his work in the field. (*Id.*, Ex. 23.) In addition, Campbell was also required to take and pass (with a 70 percent score) a written ER guidance test by December 21, 2008. (*Id.*)

Crawford developed the ER guidance test that was administered to Campbell. Crawford developed the test based on a similar one he had given to Farmer and Dave Riestenberg, two on-scene coordinators, years earlier during Crawford's time as a supervisor in the ER unit. (Crawford Dep. 42-44, ECF No. 55; Crawford Aff. ¶ 7.) Crawford administered the test to Farmer and Riestenberg during the 1990s as a way to evaluate their knowledge as on-site coordinators in the ER program. (*Id.*) Crawford prepared Campbell's test (which was updated to conform to current rules and regulations) for similar reasons, "to evaluate [Campbell's] knowledge as an OSC, and help identify areas of improvement." (*Id.* ¶ 8.) Similarly, Defendant Starkey testified that the test was given to Campbell as "a way to help [Campbell] focus on his knowledge and understanding of the program that he wasn't competent in or up to speed on." (Starkey Dep. 11-12, ECF No. 54.) Campbell did not achieve a passing score the first time he

took the test, but achieved a passing score of 72 percent on December 31, 2008. (Nickel Dep. 25.)

In August 2009, Nickel rated Campbell as "unsatisfactory" in his performance evaluation. (I Campbell Dep. Ex. 39.) Campbell was measured "below target" for his knowledge and competency in the ER program and completing his ER reports within established time frames. (*Id.*) Campbell measured "Does Not Meet" for the overall quality of his work, quantity and timeliness of his work, and his problem solving and decision making. (*Id.*) Campbell also measured "Does Not Meet" for his communication skills; the evaluation in this respect specifically cited recurring errors in Campbell's written reports. (*Id.*) The performance evaluation also referred to the test that Campbell took, citing the test results as an indication that Campbell was not mastering the ER program and not putting the time and effort necessary to learn and understand it. (Starkey Dep. 15.)

Campbell appealed his performance evaluation and also filed a grievance through his union. (I Campbell Dep. Ex. 40; II Campbell Dep. Ex. 43.) Through his attorney, Campbell also challenged as racially discriminatory the test that was administered to him. (I Campbell Dep., Ex. 41.) Campbell's appeal and grievance were denied. (II Campbell Dep., Exs. 44, 48.) Even though the grievance was denied, the performance evaluation was removed from Campbell's personnel file as part of a "good faith attempt to resolve the issues underlying" the grievance; Campbell and his union representative signed off on this resolution of the grievance. (*Id.*, Ex. 49.) In any event, the performance evaluation did not result in the denial of a step increase in Campbell's salary: because management did not complete his evaluation within the time specified in the collective bargaining agreement, Ohio EPA was not permitted to use the

"unsatisfactory" rating as a basis for denying Campbell a step increase. (*Id.* at 238-39; Nordstrom Dep. 29, ECF No. 62.)

In the fall of 2009, Defendants Starkey, Nickel, and Jeff Hines decided to remove Campbell's ER responsibilities. (Hines Aff. ¶ 8.) The three reached their decision after consultation with Crawford and Kevin Clouse (from the ER central office), basing the decision on Campbell's failure to significantly improve his knowledge and abilities in the ER unit despite what they believed to be ample training opportunities and support. (*Id.*) Campbell was not transferred to a different division of the Southwest District Office and Nickel remained Campbell's supervisor after the change. (*Id.*) Campbell's duties with ER, which were only 40 percent of his overall duties as an Environmental Specialist II, were reallocated to the other on-scene coordinators in the ER. As for the 40 percent of Campbell's duties there were no longer devoted to the ER, Campbell was reassigned to handle responsibilities in the Remedial Response ("RR") unit. (*Id.*)

Campbell's union filed grievances over the change in Campbell's job responsibilities. (II Campbell Dep. Exs. 52 and 53.) The first grievance alleged lost overtime opportunities due to the loss of ER work; the second grievance complained that Campbell's first work product in the RR unit had been "radically edited" and that he had not received adequate training in RR work. (*Id.*) Management denied both grievances. (*Id.*, Exs. 55, 57.) Campbell declined to pursue mediation of these grievances and the union declined to pursue arbitration. (II Campbell Dep. 381-82.)

Campbell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in March 2010. (II Campbell Dep. Ex. 54.) In the EEOC charge,

Campbell alleged race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended. (*Id.*) Specifically, Campbell alleged (1) "I am Black" and was "reassigned to a less favorable position" on October 29, 2009, and (2) that he was reassigned because "I won a grievance that I filed against them." (*Id.*) In an intake questionnaire accompanying the EEOC charge, Campbell alleged that Hines, Starkey, and Nickel discriminated against him on the basis of race and retaliated against him by removing him from his position in the ER unit. (II Campbell Dep. Ex. 54-A.)

Campbell then commenced this lawsuit on December 15, 2010. (Compl., ECF No. 2.) Campbell later filed an Amended Complaint, naming Ohio EPA Director Scott Nally, Ohio EPA Administrator Hines, Ohio EPA Environmental Manager Starkey, and Ohio EPA Environmental Supervisor Nickel as Defendants. (Am. Compl., ECF No. 13.) Campbell alleged four claims for relief—(1) a state-law race discrimination claim under Ohio Rev. Code Chapter 4112, (2) a claim under 42 U.S.C. § 1983 premised on a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, (3) a claim under 42 U.S.C. § 1983 premised upon a substantive due process violation, and (4) a federal race discrimination claim under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et seq.). (*Id.*) This Court granted Defendants' motion to dismiss various claims for relief asserted in the Amended Complaint. Specifically, the Court dismissed (1) the state-law claims brought in both the Defendants' individual and official capacities (Opinion and Order 4-7, ECF No. 24; Order, ECF No. 29), (2) the Title VII claims brought in the Defendants' individual capacities (ECF No. 24 at 12-13), (3) both of Campbell's claims brought under Section 1983 in the Defendants' official capacity, on Eleventh Amendment grounds (*id.* at 13), and (4) Campbell's individual-

capacity Section 1983 claim premised on substantive due process (*id.* at 14).

Following this Court's rulings on the Defendants' motion to dismiss, there are only two claims remaining in this lawsuit—(1) Campbell's Title VII claim brought against Defendants in their official capacities and (2) Campbell's Section 1983 individual capacity claim based upon an alleged equal protection violation. (*Id.* at 16-17 and Order, ECF No. 29.) The Defendants move for summary judgment on these remaining claims and their motion is fully briefed and ripe for this Court's adjudication.

## II. Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods. v. United Techs. Auto., Inc*., 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

The moving party bears the initial burden of presenting parts of the record which illustrate that no genuine issue of material fact exists. *Havensure, L.L.C., v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 315 (6th Cir. 2010) (citing *White v. Baxter Healthcare Corp*., 533 F.3d 381, 389-90 (6th Cir. 2008); *Celotex Corp*., 477 U.S. at 32). In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538

(1986)); *see also Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).

In response to a properly supported motion for summary judgment, the nonmoving party cannot relying on mere allegations or denials of the moving party's pleadings and arguments. Rather, the nonmoving party must establish specific facts showing there is a genuine issue of material fact that precludes summary judgment. *Havensure*, 595 F.3d at 315 (citing *Moldowan v. City of Warren*, 578 F.3d 351, 354 (6th Cir. 2009)). A *genuine* issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

## A. Plaintiff's Deficient Opposition to Summary Judgment

As an initial matter, the Court is forced to address whether Campbell's memorandum in opposition to Defendants' motion for summary judgment satisfies Campbell's burden as the nonmoving party under Fed. R. Civ. P. 56. Campbell's memorandum in opposition is unusual in its form and content, making it difficult in some instances for the Court to discern what Campbell's arguments in opposition to Defendants' motion for summary judgment actually are and what, if any, theories of liability Campbell has abandoned from his Amended Complaint.

Campbell's opposition contains a lengthy section titled "Background and Evidence Establishing Issues of Fact," in which he cites to evidence from various portions of the record to support both a disparate treatment and disparate impact theory of race discrimination under Title

VII.  (Pl.'s Opp. 4-11, ECF No. 65.)  This section of Campbell's memorandum also contains argument regarding the law applicable to disparate impact and disparate treatment claims, with citation to statutes, regulations, and numerous cases.  (*Id.*)  Later in the opposition, Campbell has a section titled "Title VII Claims," in which he sets forth additional law regarding the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and a plaintiff's method of establishing "a circumstantial *prima facie* case of unlawful race discrimination."  (*Id.* at 14.)  Campbell also has subsections devoted to reciting (with case citations) the applicable law regarding an employer's burden to articulate a nondiscriminatory reason for an employment action and a plaintiff's burden to show some evidence that the proffered reason is false, thereby supporting an inference of discrimination.  (*Id.* at 15-19.)

While the "Title VII Claims" argument section of Campbell's opposition is heavy on recitation of applicable case law, it is conspicuously light on argument regarding the factual record in *this* case.  Indeed, Campbell's subsection titled "*Prima Facie*" is conclusory in its presentation of how Campbell satisfies the *prima facie* case; Campbell devotes just one sentence to each element of the *prima facie* case, without citation to any record evidence to support any of the statements made.  (*Id.* at 15.)  And even though Campbell's opposition devotes more than three pages to a subsection titled "Pretext," the subsection contains no argument applying the factual record in *this* case to the case law cited and discussed therein.  (*Id.* at 16-19.)  Instead, Campbell finishes his memorandum in opposition with a section titled "Material Facts in Dispute," which reads in its entirety:

Summary judgment may not be awarded here for the reason the following material facts remain in dispute.

1.    Whether Mr. Campbell was discriminated against by reason of color or race;
2.    Whether the EPA's written policies accurately reflect the actual operation of its performance evaluation system within EPA's Southwest Division;
3.    Whether defendants retaliated against Mr. Campbell for complaining about an invalid racially discriminatory test;
4.    Whether this invalid test has ever been given to any white employee;
5.    Whether defendants created a hostile work environment for Mr. Campbell;
6.    Whether Mr. Campbell was demoted;
7.    Whether blacks have been excluded intentionally from ER; and
8.    Whether Mr. Campbell was micromanaged in order to develop a pretext for his ouster.

Also, Mr. Campbell has stated the following in his Affidavit creating additional issues of fact:

1.    Blacks have historically been denied assignment to ER;
2.    Given the total lack of training and guidance, Defendants' performance argument is a pretext; and
3.    Whether written communication skills has ever been the basis for assignment from ER.

(*Id.* at 19.)

In listing 11 material facts purportedly in dispute without connecting them to his legal arguments or theories of liability, Campbell leaves this Court to connect the dots on its own. More problematic, Campbell does not cite (apart from the reference to his Affidavit) to the portion(s) of the record that support the assertions made as "material facts in dispute." The Court "has no duty when deciding a motion for summary judgment to scour the record for evidence to support a plaintiff's claims." *AbdulSalaam v. Franklin Cty. Bd. of Commrs.*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009).

Without more, Campbell has arguably provided nothing more than his own subjective

belief that he was unlawfully discriminated against. But neither general assertions of discrimination nor an unsubstantiated belief of discrimination are enough to overcome summary judgment. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997). Campbell's inadequately supported opposition in response to Defendants' summary judgment motion provides an ample basis for this Court to grant Defendants' motion and enter judgment in their favor as a matter of law. Nonetheless, in the interests of justice and to the extent that the Court may be able to glean portions of the record cited in support of Campbell's arguments elsewhere in his opposition memorandum (*e.g.*, the "Background and Evidence" section of the opposition), the Court will address the parties' summary judgment arguments on the merits.

### B. Title VII Disparate Treatment

Defendants contend that summary judgment in their favor is appropriate as to Campbell's claim of race discrimination based on a disparate treatment theory.[2] Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any [employee] with respect to the [employee's] compensation, terms, conditions, or privileges of employment, because of such [employee's] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In this case, Campbell alleges that he was subjected to race discrimination in his employment with the Ohio EPA.

A plaintiff may prove that he was subject to discriminatory treatment based on race or

---

[2]As noted above, the Title VII claims remain against the Defendants only in their *official* capacities. This Court earlier found that the issue of whether supervisory liability under Title VII exists is unresolved in the Sixth Circuit. (Opinion and Order 8, ECF No. 24.) The Court left that issue for another day, as Defendants presented no argument in their motion to dismiss as to whether a Title VII official capacity claim was viable against them. (*Id.* at 9.) The issue need not be visited here, however, as Defendants' motion for summary judgment does not argue that they may not be held liable in their official capacities.

age using either direct or circumstantial evidence. Where, as here, there is no direct evidence of discrimination,[3] a plaintiff's circumstantial evidence is analyzed under the familiar burden shifting framework established by the United States Supreme Court in *McDonnell Douglas* and refined in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Under the *McDonnell Douglas* framework, the plaintiff bears the burden to demonstrate a *prima facie* case of unlawful discrimination; the burden then shifts to the employer to articulate a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show that the employer's explanation is pretext (*i.e.*, "that the employer's explanation was fabricated to conceal an illegal motive"). *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *McDonnell Douglas*, 411 U.S. at 802-04).

To satisfy his burden of demonstrating a *prima facie* case of discrimination, Campbell must show facts demonstrating (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class or that similarly situated employees outside of his protected class were treated more favorably. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). In this case, it is undisputed that Campbell, who is African-American, is a member of a protected class. Nor do Defendants in their summary judgment motion dispute Campbell's

---

[3]Direct evidence is the kind that, if believed, requires a factfinder to conclude *without the aid of inferences* that unlawful discrimination at least partly motivated the employer in the challenged employment action. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Such direct evidence might include facially discriminatory employment policy documents or statements by decision makers that show discriminatory animus. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Campbell cites no direct evidence of race discrimination in this case.

qualifications to work in Ohio EPA. But Defendants argue that Campbell cannot make out a *prima facie* case because he neither suffered an adverse employment action nor has identified a similarly-situated employee outside of his protected class whom Defendants treated differently. (Defs.' Mot. 13-15, ECF No. 56.)

### 1.    Adverse Employment Action

In his memorandum in opposition to summary judgment, Campbell relies upon only one theory of an adverse employment action to make out a *prima facie* case: he argues that he "was demoted to a position where he received less overtime and has not been evaluated for six years." (Pl.'s Opp. 15, ECF No. 65.)  In other words, Campbell characterizes his removal from the ER unit in the fall of 2009 as a "demotion" that has adversely affected the terms and conditions of his employment for purposes of a Title VII *prima facie* case.

Defendants dispute Campbell's characterization of his removal from the ER unit, emphasizing that his title and base salary did not change.  (Defs.' Mot. 13-14, ECF No. 56.)  But in his recitation of the facts supporting his claims, Campbell directs this Court to evidence in the record to indicate that his total compensation potential dropped dramatically after his removal from the ER unit due to the amount of lost overtime.  (Pl.'s Opp.  Specifically, there is evidence in the record suggesting that on-call and overtime opportunities are enhanced for employees in the ER unit because of the "occurrence of spills" and the "frequency of emergencies" to which the ER unit is required to respond.  (Haensel Dep. 22-23, ECF No. 63-1.)

An "adverse" employment action is a *materially* adverse change in the terms or conditions of employment due to the employer's conduct.  *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).  "A materially adverse change might be indicated by a

termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices that might be unique to a particular situation." *Ford v. General Motors Corp.*,

305 F.3d 545, 553 (6th Cir. 2002) (internal quotations omitted). Reassignments without changes

in salary, benefits, work title, or work hours usually do not qualify as adverse employment

actions. *Policastro*, 297 F.3d at 539. The Sixth Circuit has also opined that lost opportunities

for overtime pay (when properly supported by evidence) can qualify as an adverse employment

action for purposes of establishing a Title VII *prima facie* case. *See Broska v. Henderson*, 70 F.

App'x 262, 268 (6th Cir. 2003).

In this case, Campbell has identified evidence in the record to indicate that Defendants'

decision to transition him out of the ER unit resulted in lost opportunities for overtime pay and,

therefore, a reduction in his overall income. The Court therefore finds that Campbell has at least

raised a genuine issue with regard to whether his removal from the ER unit is a tangible, adverse

employment action. Accordingly, the Court finds that Campbell satisfies this prong of the *prima*

*facie* case.

### 2.    Similarly Situated Employees

Defendants also argue that Campbell cannot satisfy the fourth prong of a *prima facie* case

for race discrimination because he cannot show that he was replaced by someone outside of his

protected class or treated less favorably than a similarly situated employee outside of his

protected class. For his part, Campbell does not in his opposition to summary judgment contend

that he was "replaced" in the ER by someone outside of his protected class.[4]  Rather, he seeks to

satisfy the fourth prong by arguing "[n]o one else in ER has received the treatment imposed on

[him]."  (Pl.'s Opp. 15, ECF No. 65.)  Campbell complains in particular about the following

instances of alleged disparate treatment:

- Campbell was the only ER employee to be given a written examination during his employment in the ER unit that he was required to pass and which examination was used as a basis for his 2008 performance evaluation;

- a "pattern" of disparate supervision;

- inadequate mentoring;

- having to file a claim with his homeowners' insurance when his state-owned laptop was stolen rather than receive reimbursement directly from Ohio EPA; and

- not being allowed to take his state-owned vehicle home when other ER employees were allowed to do so.

(Pl.'s Opp. 3-11, ECF No. 65.)  None of these supposedly disparate actions, whether considered

individually or collectively, helps Campbell in this case.

A plaintiff trying to make out a *prima facie* case for discrimination has the burden to

establish that a similarly situated person outside the protected class was treated more favorably

than the plaintiff.  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728-29 (6th Cir. 2004).  For an

individual to be similarly situated to a plaintiff, a plaintiff must demonstrate that he and his

_____

[4]There is testimony in the record indicating that Campbell's workload in the ER unit was
absorbed by Crawford and Farmer.  (Nickel Dep. 27, ECF No. 53.)  Redistributing Campbell's
work among remaining employees does not constitute "replacement."  *Grosjean v. First Energy
Corp.*, 349 F.3d 332, 336 (6th Cir. 2003).

proposed comparator are "similar in 'all of the relevant aspects.' " *Id.* (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).  Generally, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Campbell makes much of the fact that he was the only African-American employee in the ER unit and that he was the only one required to take a written examination that was used as part of his evaluation.  In fact, it is quite evident from the averments in the Amended Complaint and in the arguments in Campbell's opposition to summary judgment that the written examination is the primary pillar upon which he supports his claim of race discrimination.  The problem with Campbell's argument, however, is that he has failed to establish the existence of a similarly situated comparator employee with the ER unit who was *not* required to take a written examination.

At the time Campbell worked in the ER unit, there were only three other employees in the ER unit who performed duties similar to him—Crawford, Farmer, and Combs.  None of these individuals, however, is a similarly situated employee for purposes of measuring the fourth prong of Campbell's *prima facie* case.  Before being transferred into the ER unit, Campbell had no experience within ER and was assigned to the ER unit for only 40 percent of his total duties. (II Campbell Dep. 343, ECF No. 52.)  In contrast, Crawford (the lead worker in the unit) had over 29 years of experience, Farmer had more than 20 years of experience, and both of them

worked full-time for the ER unit. While Combs was also part-time like Campbell, whatever similarity between them ended there: Combs had over ten years of experience in ER work. Thus, all three of the employees who did on-scene investigations with the ER unit had a base of knowledge that Campbell did not possess.[5]

Just as crucially, Campbell has not identified anyone else outside of his protected classification who had the same job performance deficiencies that led to the decision to administer a written examination to test Campbell's progress in learning aspects of the ER unit's work. This is significant, as Defendants contend that the reason the written examination was administered to Campbell in the first place was because of lack of improvement in performing his job duties as an ER on-scene coordinator during his first two years in the ER unit. For Campbell to show that giving him a written examination was a form of disparate treatment, it was, at a minimum, incumbent upon Campbell to provide some evidence that other ER employees outside the protected class were *not* subjected to the same testing despite similar performance-related deficiencies. *See Kidd v. Abbott Labs.*, No. 2:10-cv-157, 2011 U.S. Dist. LEXIS 42699, at *21-22 (S.D. Ohio Apr. 20, 2011) (finding that plaintiff failed to satisfy fourth prong when he failed to rebut defendant employer's argument that alleged similarly situated employees had the same documented performance deficiencies as plaintiff).

The remaining examples Campbell cites of disparate treatment also fail for similar reasons. For none of them does Campbell cite to any similarly-situated employee outside of his protected classification who was treated differently under similar circumstances. Rather, the

_____

[5]In addition, Combs reported to a different supervisor than Crawford, Farmer, and Campbell, as he spent the vast majority of his time performing criminal investigations for the Ohio EPA's Office of Special Investigations.

theme of Campbell's argument appears to be nothing more than the unsupported inference that he *must* be the victim of race discrimination because he was the only African-American employee in the ER unit in which he worked. But this type of rank speculation is a wholly inadequate manner in which to show a *prima facie* case of discrimination. Speculation cannot take the place of actually satisfying the fourth prong through evidence that a similarly-situated employee outside Campbell's protected class was treated differently.

For these reasons, Campbell has failed to satisfy the fourth prong and has accordingly failed to satisfy his burden of setting forth a *prima facie* case of race discrimination under Title VII. Defendants are therefore entitled to summary judgment on Campbell's Title VII disparate treatment claim.

### 3.      Employer's Nondiscriminatory Reason and Pretext

Even if Campbell were able to establish a *prima facie* case of age or race discrimination, Defendants argue that they are still entitled to summary judgment because (1) they have articulated a legitimate nondiscriminatory reason for moving Campbell out of the ER unit and (2) Campbell has not come forward with evidence to show that the decision was a pretext for discrimination. The Court agrees that this is also a valid basis for summary judgment in Defendants' favor on Campbell's Title VII disparate treatment claim.

Defendants' stated reason for removing Campbell from the ER unit was his documented poor performance. (Defs.' Mot. 16, ECF No. 56.) It should go without saying that poor performance on the job is a legitimate nondiscriminatory reason for an employer's decision to take action affecting an employee's employment. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001). With Defendants having articulated a valid rationale,

19

the burden shifts back to Campbell to show that the reason is pretextual, by identifying evidence to show either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate Defendants' decision, or (3) that the reasons given were insufficient to motivate Defendants' decision. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Campbell has failed in his burden to show pretext. In response to Defendants' articulation of a legitimate nondiscriminatory reason, Campbell argues simply that (1) the "testing" and "micromanagement of Mr. Campbell" demonstrate pretext because he is the only one that has been subject to that type of treatment and (2) he "has not been evaluated in six years." (Pl.'s Opp. 16 and 18, ECF No. 65.) But this argument falls far short of satisfying Campbell's burden to show a genuine issue of fact to defeat summary judgment. Campbell fails completely to explain how the testing, micromanagement, or absence of evaluation fit within any of the *Manzer* methods of demonstrating pretext. Instead, it appears that Campbell is conflating the *prima facie* case with the pretext inquiry: the acts he cites are more naturally viewed, if anything, as examples of disparate treatment to satisfy the fourth prong of the *prima facie* case. What they do not demonstrate, however, is pretext for discrimination.

Having failed to show evidence that would suggest to a reasonable factfinder that the Defendants' nondiscriminatory reason for removing Campbell from the ER unit was pretextual, Campbell has failed in his summary judgment burden.

## C. Title VII Hostile Environment and Retaliation

Defendants also move for summary judgment on Campbell's theories of Title VII liability based on a hostile environment and retaliation. As to both of these Title VII theories,

Defendants argue that Campbell cannot make a requisite showing of a *prima facie* case. In their reply brief in support of summary judgment, Defendants additionally argue that Campbell failed to "put forth any evidence of a hostile work environment" and "essentially waives his retaliation claim by failing to brief it" in his memorandum in opposition to summary judgment. (Defs.' Reply 14, ECF No. 68.)

This Court agrees with Defendants' reply argument: Campbell's opposition failed to present actual argument specifically related to his Title VII retaliation and hostile environment theories. In response to Defendants' motion for summary judgment on his hostile environment claim, Campbell states simply that "material facts remain in dispute" about "[w]hether defendants created a hostile work environment for [him]." (Pl.'s Opp. 19, ECF No. 65.) Similarly, the entirety of Campbell's argument devoted to retaliation is simply that "material facts remain in dispute" regarding "[w]hether defendants retaliated against Mr. Campbell for complaining about an invalid racially discriminatory test." (Pl.'s Opp. 19, ECF No. 65.) Campbell directs the Court to no parts of the record that support his theories of hostile environment or retaliation liability; nor does Campbell's memorandum in opposition identify the applicable case law related to Title VII retaliation or hostile environment, much less articulate an argument concerning how he satisfies a *prima facie* case on either theory based on the applicable law.

The Court views this effort as less than conclusory; consequently, Campbell is deemed to have abandoned these claims. See *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of*

*Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24-25 (6th Cir. 2003) (stating that a plaintiff's failure to brief a claim in the district court is an abandonment of the claim); *Colston v. Cleveland Pub. Library*, No. 1:12-CV-204, 2012 WL 3309663, at *2 n.2 (N.D. Ohio Aug. 13, 2012) (deeming a claim abandoned and granting summary judgment when a plaintiff "did not respond or even mention [the] claim in her oppositions to Defendants' motions for summary judgment"); *Thomas v. Starbucks Corp.*, No. 3:10-1158, 2012 WL 1900919, at *4 (M.D. Tenn. May 24, 2012) (holding that a district court can decline to consider a claim's merits when a plaintiff fails to address the claim in a summary judgment response); *EEOC v. Home Depot USA*, No. 4:07-cv-143, 2009 WL 395835, at *17 (N.D. Ohio Feb. 17, 2009) ("When a plaintiff asserts a claim in a complaint but then fails to delineate that claim in her brief in opposition to summary judgment, that claim is deemed abandoned."); *Anglers of the Au Sable v. United States Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.").  With Campbell having abandoned these claims, Defendants are entitled to summary judgment on them.

### D.     Title VII Disparate Impact

Campbell's Amended Complaint also alleges a Title VII claim under a "disparate impact" theory.  This claim focuses on the written examination Campbell was required to take and pass in 2008 during his employment with the ER unit.  Campbell argues that the test had a disparate impact upon African-Americans and that the test was "illegal" because the Ohio EPA

did not validate it pursuant to the Uniform Guidelines on Employee Selection Procedures contained in the Code of Federal Regulations. (Pl.'s Opp. 4-5.) *See* 29 C.F.R. § 1607.1 *et seq.*

A *prima face* case of disparate impact under Title VII requires the plaintiff to (1) identify a specific, facially neutral employment practice to be challenged, (2) through relevant statistical analysis, prove that the challenged practice has an adverse impact on a protected group. *Dunlap v. TVA*, 519 F.3d 626, 629-30 (6th Cir. 2008). Defendants move for summary judgment on Campbell's disparate impact claim, arguing that Campbell has not identified a facially neutral employment practice that operates disproportionately to the detriment of African-Americans. (Defs.' Mot. 11 n.1, ECF No. 56; Defs.' Reply 9, ECF No. 68.) Indeed, the record evidence (and Campbell's position, for that matter) is such that the test was not part of a "practice" within the ER unit — the test in question was administered only to Campbell during the time period challenged in this case.[6]

Campbell has failed to set forth an actionable theory of "disparate impact" under Title VII. Essentially, Campbell asks this Court to allow him to proceed with a disparate impact theory based on little more than the fact that *he* is the only person who was required to take the examination and that he is African-American. But at its core, Campbell's gripe is about disparate *treatment* of him, not disparate *impact* on an entire class of people (*i.e.*, African-Americans and/or other racial minorities); indeed, since Campbell represents the entirety of the sample size of African-Americans required to take the examination, he can satisfy neither prong of a *prima facie* case of disparate impact. Campbell did not present evidence that the

---

[6]Crawford testified that he administered a similar, but not identical, test to two other on-scene coordinators (including Farmer) years earlier to evaluate their knowledge of the job. (Crawford Aff. ¶ 7.)

examination was used for other employment decisions within the ER unit (indeed, his complaint is that it was not) and offers no statistical proof to show that a protected group was adversely impacted by the examination. The Court therefore concludes that Campbell's disparate impact theory must fail. *See Dunlap* at 630 (finding no actionable claim of disparate impact when the plaintiff complained only of the process used in *his own* job interview and not upon the process used generally for all applicants).

Defendants motion for summary judgment on Campbell's disparate impact theory of liability is granted.

## E.    Section 1983 Equal Protection

As noted previously, this Court's previous ruling on Defendants' motion to dismiss left Campbell's Section 1983 equal protection claim pending as against Defendants in their individual capacities. Defendants move for summary judgment on this claim based on the doctrine of qualified immunity. (Defs.' Mot. 22, ECF No. 56.) Specifically, Defendants contend that their actions at all times were objectively reasonable under clearly established law. (*Id.*) *See generally Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

Campbell's opposition to summary judgment is devoted entirely to his claims of Title VII liability. Campbell does not respond to Defendants' arguments regarding the applicability of qualified immunity to defeat Campbell's Section 1983 claim. Accordingly, for the reasons set forth in Section II.C. above, Campbell's Section 1983 equal protection claim is deemed abandoned. Defendants' motion for summary judgment on the Section 1983 equal protection claim is granted.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 56) is

**GRANTED**. The Clerk is hereby directed to enter final judgment in favor of Defendants.

**IT IS SO ORDERED**.

_____/s/ Gregory L. Frost_____
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**